**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**VIRGINIA DICKSON,**

                    **Plaintiff,**                          **1:06-CV-0511**
                                                            **(NAM/GHL)**

          **v.**

**MICHAEL J. ASTRUE**, Commissioner of Social
Security Administration,[1]

                    **Defendant.**
_____

**APPEARANCES:**                                  **OF COUNSEL:**

*For Plaintiff*
Empire Justice Center                             Louise Maria Tarantino, Esq.
119 Washington Avenue
2nd Floor
Albany, New York 12210

*For Defendant*
Social Security Administration                    Karla J. Gwinn, Esq.
Office of Regional General Counsel                Barbara L. Spivak, Esq.
Region II
26 Federal Plaza - Room 3904
New York, New York 10278

**Norman A. Mordue, Chief Judge:**

                    **MEMORANDUM-DECISION AND ORDER**

**I.      INTRODUCTION**

          In this action, plaintiff Virginia Dickson, moves, pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), for a review of a decision by the Commissioner of Social Security denying plaintiff's

_____

          [1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007. Pursuant to Federal
Rule of Civil Procedure 25(d)(1), Michael J. Astrue is substituted as the Defendant in this suit.

application for disability benefits. (Dkt. No. 1). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.     BACKGROUND

Plaintiff was born on October 12, 1957 and was 46 years old at the time of the administrative hearing on October 6, 2004.  (Administrative Transcript at p. 21, 202).[2]  Plaintiff has 3 children (2 sons and 1 daughter) and has never been married.  (T. 203-204).  At the time of the hearing, plaintiff resided in an apartment at 929 Emmit Street in Schenectady, New York with her 2 grandsons, ages 10 and 11.  (T. 202).  Plaintiff's son resided in an apartment downstairs with his 9 year old daughter.  Plaintiff's grandsons came to live with her in 1999 after plaintiff's daughter was incarcerated at Bedford Correctional Facility.  (T. 203).

Plaintiff attended high school but dropped out before completing the 11th grade.  (T. 205). In 1980, plaintiff attended Schenectady Community College and obtained her certification to become a nurses aide. (T. 66, 208).

From 1992 until 1994, plaintiff was employed as a teacher's aide at an elementary school for children with special needs. (T. 63).   Plaintiff's responsibilities included walking children to and from their bus and programs; assisting children with lunch; assisting the teacher; and controlling poorly behaved children. (T. 63).  Plaintiff's job required her to walk for 3 hours, stand for 2 hours, and sit for 1 hour during an 8 hour workday. (T. 64).  Plaintiff was occasionally required to lift a child weighing 50 pounds and frequently was required to lift 25 pounds. (T. 64). Prior to 1992, plaintiff was employed as a lunch aide at an elementary school and a nurses aide at a nursing home. (T. 63, 75).

---

[2] Portions of the administrative transcript, Dkt. No. 5, will be cited herein as "(T. )".

Plaintiff alleges that she became disabled on October 27, 1994 after a motor vehicle accident due to an injury to her back, depression and asthma. (T. 34, 40).  The last day that plaintiff worked in any capacity was October 27, 1994.  (T. 53).

### A.    Medical Evidence

The medical evidence in the record before the ALJ included treatment records from therapists and psychiatrists at Ellis Hospital Mental Health Services.[3]   Plaintiff received treatment at Ellis Hospital from Norma Poll, Ph.D, Bhart Langer, M.D., and Stephen Hudyncia, M.D.

On April 27, 1999, plaintiff underwent an initial evaluation at Ellis Hospital.[4]  (T. 101). Plaintiff reported to the psychologist that she suffered from arthritis in her spine due to a car accident in 1994.  (T. 101).  Plaintiff stated that she continued to work after the accident but that she "restrained a child and felt pain".  (T. 101).  Plaintiff advised the psychologist that she lived with her daughter and her two grandsons. (T. 101).  Plaintiff claimed that she was taking Zyprexa and Buspar.[5]  Plaintiff claimed that she received treatment for her depression from "Dr. Sheldon at Sunnyview", Dr. Roldan and Dr. Bush.[6]  (T. 104).  Plaintiff admitted that she never received any prior counseling.  (T. 104).  The psychologist noted that plaintiff was "frustrated with her situation" and lack of income. (T. 103).

---

[3] The record also contains treatment records from St. Clare's Hospital however, the records relate to conditions/treatment not relevant to the issues herein.  Therefore, a summary of those records has been omitted from this discussion.  (T. 93-98).

[4] The name of the psychologist who prepared plaintiff's "Core History" is illegible.

[5] Zyprexa is used as an antipsychotic in the management of schizophrenia and for short-term treatment of manic episodes in bipolar disorder.  *Dorland's Illustrated Medical Dictionary*, 1336, 2125 (31st ed. 2007). BuSpar is an antianxiety agent used in the treatment of anxiety disorders and for short-term relief of anxiety symptoms. *Id*. at 269.

[6] The record does not contain any treatment notes/reports from Dr. Sheldon, Sunnyview, Dr. Roldan or Dr. Bush.

On September 1, 2002, plaintiff returned to Ellis Hospital Mental Health.[7]  (T. 100).  A report was prepared outlining a plan for plaintiff's "goal".[8]  (T. 100).  The doctor noted that plaintiff's goals were to "reduce frequency of depressive symptomology"; to remain compliant with medications and treatment; to work on issues around care taking of her grandsons due to her daughter's incarceration; and to report all instances of depression to therapist.  (T. 100).

On June 1, 2003, plaintiff's psychiatrist and clinician prepared a nine month review.[9]  (T. 99).  The psychiatrist noted "patient continues to deal with a lot of stress re: life and grandkids dad not being involved". (T. 99).  On December 4, 2003, a quarterly treatment plan review was prepared by N. Poll, Ph.D. and reviewed by a physician.[10] (T. 192).  Dr. Poll noted that plaintiff was complaint with appointments and medication and that plaintiff expressed her concerns and problem solving skills effectively. (T. 192).  Dr. Poll noted that plaintiff needed to work on her stressors due to her family issues. (T. 192).

On January 8, 2004, plaintiff had a 45-minute therapy session with Dr. Poll.  (T. 190).  Dr. Poll indicated that plaintiff had stresses due to her daughter's demands and financial concerns. (T. 190).  Plaintiff advised that she wanted to take computer classes but child care was difficult due to her youngest grandson's diagnosis of  ADHD.  (T. 190).  Dr. Poll stated that plaintiff was compliant with medication but that plaintiff felt more depressed and isolated and she withdrew

---

[7] The record does not contain any reports/notations from Ellis Hospital from May 1999 through August 2002.

[8] The names of the psychiatrist and clinician who participated in the preparation of the plan are illegible.

[9] The names of the psychiatrist and clinician who prepared the review are illegible.  The record does not contain any treatment notes from Ellis Hospital from September 2002 through May 2003.

[10] The name of the physician is illegible.  The record does not contain any treatment notes from Ellis Hospital from July 2003 through December 2003.

from social activity outside her home.  (T. 190).  Dr. Poll advised plaintiff to continue bi-weekly meetings. (T. 190).

On January 19, 2004, plaintiff had a 15-minute visit with Dr. Langer, a physician.  (T. 189).  Dr. Langer noted plaintiff continued to do well under the circumstances and that her holiday was "ok".  (T. 189).  Dr. Langer noted plaintiff was at her "baseline - essentially stable" and that plaintiff showed "good symptom control" and displayed "no evidence of any acute psychiatric decompensation".  (T. 189).  Dr. Langer advised plaintiff to continue with her current medications including Zyprexa, Zoloft, BuSpar and Remeron.[11] (T. 189).

On January 27, 2004 and February 11, 2004 plaintiff returned to Dr. Poll for treatment.  Dr. Poll noted that plaintiff was concerned about her grandson's medical and behavioral issues.  (T. 188).  Plaintiff indicated that she spent all her time at home but that she wanted to register for computer classes and considered working. (T. 187).   Dr. Poll noted plaintiff was isolated and depressed with a stable mood and anxious affect. (T. 187-188).

On February 23, 2004, plaintiff had a 15-minute follow up visit with Dr. Langer. (T. 186).  Dr. Langer noted plaintiff "continued to do well under the circumstances" and that plaintiff's sleep and appetite were "ok".  (T. 186).  Dr. Langer noted plaintiff's desire to move from her neighborhood to be away from her children as her sons were "again involved in legal trouble". (T. 186).   Dr. Langer opined that plaintiff was "stable and unchanged" and showed "no evidence of acute psychiatric decompensation". (T. 186).   Dr. Langer advised plaintiff to continue with her medications.  (T. 186).

In February, March and April 2004, plaintiff treated with Dr. Poll.  (T. 177-185).  Dr. Poll continually noted that plaintiff was "isolated" and "less hopeless" with a stable mode and normal

---

[11] Zoloft is used to treat depressive, obsessive-compulsive, and panic disorders.  *Dorland's* at 1724, 2120. Remeron is an antidepressant compound unrelated to any of the classes of anti-depressants.  *Id.* at 1186, 1646.

affect. (T. 177, 183, 185). Plaintiff discussed working part time but advised Dr. Poll that she was limited due to child care constraints.  (T. 177).  Plaintiff stated that visiting her daughter had "helped" and that she was looking forward to another visit with the "support of the local church". (T. 177).  Plaintiff advised that she wanted to change communities due to drug dealing in her neighborhood.  (T. 177).  In April 2004, Dr. Langer noted plaintiff "continued to do well" and noted plaintiff was "essentially stable and unchanged" without psychosis.  (T. 176, 180).

In May 2004, plaintiff treated with Dr. Poll on two occasions.  (T. 174-175).  Dr. Poll noted that plaintiff needed to manage stressors but that her affect was within normal limits, mood was stable and she was mildly depressed.  (T. 175).  Plaintiff advised that she was "open to part time employment".  (T. 174).

On May 19, 2004, plaintiff was evaluated by a new psychiatrist, Dr. Hudyncia.  (T. 173). Dr. Hudyncia noted plaintiff had a 10 year history of treatment for depression.[12] (T. 173).  Dr. Hudyncia noted that plaintiff's daughter had been in jail since 1999 for murder and that plaintiff's son was also in jail. (T. 173).  Dr. Hudyncia concluded plaintiff's "depression in remission with dramatic psychosocial stressors, personality traits".  (T. 173).  Dr. Hudyncia advised plaintiff to continue with her current treatment.  (T. 173).

On June 15, 2004, Dr. Poll noted that plaintiff tried to spend some time outside her home but that she continued to be socially isolated.  (T. 172).  Plaintiff advised that she was making plans for an extended trip to visit her daughter. (T. 172).  Dr. Poll noted plaintiff had a normal affect and stable mood and suggested that she return in 3 weeks. (T. 172).

On July 7, 2004, Dr. Poll noted that plaintiff was anxious, mildly depressed, with low motivation and low energy.  (T. 170).  Dr. Poll stated that plaintiff was "able to manage parental

---

[12] According to the record, plaintiff began treating at Ellis Hospital for depression in April 1999.  There are no records from any source prior to that date.

6

responsibilities, despite feeling overwhelmed". (T. 170).  Dr. Poll noted that plaintiff decided to contact her father who had not supported her in the past.  (T. 170).  Plaintiff was also contemplating her job options due to financial constraints. (T. 170).  On July 13, 2004, Dr. Hudyncia examined plaintiff and noted "[v]ery little depression but socially feels ok".  (T. 169). On July 23, 2004, Dr. Poll stated that plaintiff had a "pleasant disposition" and noted plaintiff was preparing for an extended visit with her daughter.  (T. 168).   Plaintiff indicated that she felt "rejuvenated" after visiting with her daughter and described it as a "vacation". (T. 168).  In August 2004, plaintiff expressed "no concerns" to Dr. Poll.  (T. 166-167).

On August 24, 2004, Dr. Hudyncia noted plaintiff was "more down and less motivated". (T. 165).  Plaintiff advised that she did not want to deal with social services and wanted to accept responsibility for her situation but wanted a "pill" to change how she felt. (T. 165).  Dr. Hudyncia noted plaintiff was more discouraged and diagnosed plaintiff with depression with psychosocial stressors.  (T. 165).  Dr. Hudyncia stated that it was "unclear if this is a deficiency in her anti depressant treatment" and advised plaintiff to taper and discontinue taking Zoloft.  (T. 165).  Dr. Hudyncia prescribed Effexor.[13]  (T. 165).

On September 7, 2004, Dr. Poll prepared an Annual Comprehensive Treatment Plan after plaintiff's visit.  (T. 163).  Plaintiff complained of increased depression due to her son, grandchildren and an uncle recently diagnosed with cancer.  (T. 162).  Dr. Poll noted that plaintiff was anxious and mildly depressed with low motivation and energy.  (T. 162).

On September 2, 2004, plaintiff had her last visit with Dr. Hudyncia.  Plaintiff stated she was "less stressed with kids in school".  (T. 161).   Dr. Hudyncia noted plaintiff was "improved" with no acute symptoms and opined that her depression in early remission.  (T. 161).

---

[13] Effexor is used as an antidepressant and antianxiety agent. *Dorland's* at 602, 2074.

On September 29, 2004, plaintiff had her last visit with Dr. Poll.  (T. 160).  Dr. Poll noted some improvement in plaintiff's mood and stated that plaintiff was open to referral for job assistance. (T. 160).  Dr. Poll noted that plaintiff temporarily stopped taking her psychotropic medications for fear of an interaction with pain medication.  (T. 160).  Dr. Poll opined that plaintiff's depressive symptoms "appear under control".   (T. 160).

### B.   Consultative Examinations

#### 1.   Vernon Wheeler, M.D.

On July 28, 2003, Dr. Wheeler performed an internal medicine examination at the request of the agency. (T. 105).  Plaintiff complained of a history of depression, low back problems and asthma.  (T. 105).  Plaintiff advised Dr. Wheeler that she had help from her parents but that she was able to cook, shop, shower with a chair, dress and clean a few times a week. (T. 106).

Upon examination, Dr. Wheeler noted plaintiff was not in acute distress, her gait was normal and she was able to walk without difficulty. (T. 106).  Dr. Wheeler observed that plaintiff did not need assistance rising from her chair or climbing onto the examining table. (T. 106).  Dr. Wheeler found mild scoliosis, limited lumbar flexion, negative straight leg raising and spasms. (T. 106).  Dr. Wheeler diagnosed plaintiff with depression, chronic back pain and asthma. (T. 108). Dr. Wheeler opined plaintiff would have mild limitations with any activities involving prolonged standing, sitting, walking, bending and lifting. (T. 108).

#### 2.   John Seltenreich, Ph.D.

On August 25, 2003, plaintiff underwent a psychiatric evaluation by Dr. Seltenreich, at the request of the agency. (T. 115).  Plaintiff denied any prior psychiatric hospitalizations and advised that since 1998, she had received treatment at Ellis Hospital Mental Health including psychiatric care and counseling on a weekly basis.  (T. 115).  Plaintiff complained of an increased appetite,

lack of sleep, depression and claimed that "she heard voices telling her to do bad things to herself". (T. 115). Plaintiff also claimed that she "saw shadows". (T. 116). Plaintiff advised that she was able to dress, bathe, groom, cook, manage money, take public transportation and socialized with friends and family. (T. 117).

Upon examination, Dr. Seltenreich found plaintiff cooperative with adequate social skills. (T. 116). Dr. Seltenreich noted that plaintiff was coherent; exhibited fluent and clear speech; was goal directed with no evidence of hallucinations or delusions. (T. 116). Dr. Seltenreich found plaintiff's affect was dysphoric and her mood was dysthymic. (T. 116).

Dr. Seltenreich diagnosed plaintiff with depressive disorder, asthma and back pain. (T. 117). Dr. Seltenreich opined that plaintiff was able to follow and understand simple directions and instructions. (T. 117). Dr. Seltenreich concluded that plaintiff may have mild problems with attention, concentration and stress but that plaintiff should be able to perform simple tasks. (T. 117). Dr. Seltenreich noted that plaintiff had limited ability to learn new tasks but she was able to make decisions independently and to relate with others.

## C.    Residual Functional Capacity ("RFC") Assessments

On September 19, 2003, a Psychiatric Review Technique was completed by T. Guenther, Ph.D. (T. 119). Dr. Guenther considered Listings 12.03 (Schizophrenic, Paranoid and other Psychotic Disorders) and 12.04 (Affective Disorders). (T. 119). Dr. Guenther concluded that plaintiff did not suffer from a medically determinable impairment that satisfied the diagnostic criteria of either Listing. (T. 121-122). Dr. Guenther found that plaintiff suffered from mild limitations in activities of daily living and difficulties in maintaining social functioning. (T. 129). Dr. Guenther also found plaintiff had moderate limitations in concentration, persistence or pace and no episodes of deterioration. (T. 129).

On September 19, 2003, Dr. Guenther also completed a Mental RFC Assessment. (T. 134). Dr. Guenther found plaintiff moderately limited in her ability to understand and remember detailed instructions but not otherwise significantly limited in understanding and memory. (T. 132). Dr. Guenther found plaintiff moderately limited in her ability to carry out detailed instructions, maintain concentration for extended periods or complete a normal workday and workweek. (T. 132). Dr. Guenther found plaintiff otherwise not significantly limited in her ability to concentrate. (T. 132). Dr. Guenther opined that plaintiff was not limited in her ability to interact socially or to adapt. (T. 132). Dr. Guenther noted that plaintiff was experiencing psychiatric problems but plaintiff was able to follow and understand simple, and sometimes complex instructions; maintain pace; relate well with others; and deal with minor changes in a routine work setting. (T. 134).

On September 22, 2003, a Physical RFC Assessment was completed by a state agency consultant.[14] (T. 141). The consultant found that plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for 6 hours in an 8 hour workday; and sit for 6 hours in an 8 hour workday. (T. 137).

### III.   PROCEDURAL HISTORY

On June 17, 2003, plaintiff filed an application for supplemental security income ("SSI") benefits. (T. 30). On October 7, 2003, the application was denied. (T. 31). Plaintiff requested a hearing which was held before an Administrative Law Judge ("ALJ") on October 6, 2004. (T. 21). On January 26, 2005, ALJ James S. Quinlivan issued a decision denying plaintiff's claim

---

[14] The name and qualifications of the consultant are omitted and/or illegible.

for benefits.  (T. 12-20).  On February 24, 2005, the Appeals Council denied plaintiff's request

for review, rendering the ALJ's decision the final determination of the Commissioner.  (T. 4).

Exhausting all her options for review through the Social Security Administration's tribunals,

plaintiff brings this appeal. (Dkt. No. 1).

**IV.**     **ADMINISTRATIVE LAW JUDGE'S DECISION**

The Social Security Act (the "Act") authorizes payment of disability insurance benefits to

individuals with "disabilities."  The Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less than

12 months."  42 U.S.C. § 423(d)(1)(A). There is a five-step analysis for evaluating disability

claims:

> "In essence, if the Commissioner determines (1) that the claimant is not working, (2)
> that he has a 'severe impairment,' (3) that the impairment is not one [listed in
> Appendix 1 of the regulations] that conclusively requires a determination of disability,
> and (4) that the claimant is not capable of continuing in his prior type of work, the
> Commissioner must find him disabled if (5) there is not another type of work the
> claimant can do." The claimant bears the burden of proof on the first four steps, while
> the Social Security Administration bears the burden on the last step.

*Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Draegert v. Barnhart*, 311

F.3d 468, 472 (2d Cir. 2002)); *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000) (internal

citations omitted).

In this case, the ALJ found at step one that plaintiff has not engaged in substantial gainful

activity since the alleged onset of her disability. (T. 13).  At step two, the ALJ concluded that

plaintiff's asthma/shortness of breath and arthritis are "severe impairments" within the meaning

of the Social Security Regulations (the "Regulations").  (T. 19).  At the third step of the analysis,

the ALJ determined that plaintiff's impairments did not meet or equal the severity of any

impairment listed in Appendix 1 of the Regulations.  (T. 19).  At the fourth step, the ALJ found

that plaintiff had the RFC to:

> lift/carry 20 pounds occasionally and 10 pounds frequently; stand/be on feet at least 4 hours total, one hour without interruption; no prolonged walking (½ hour at a time); sit at least five to six hours total, two hours without interruption; occasional pushing/pulling with lower extremities; no sustained/frequent overhead work; no climbing high ladders or working at unprotected heights (four feet); only occasionally climb stairs/steps/ramps; only occasionally bend/stoop, balance, (with supported/assisted at crouching/squatting), kneel or crawl; no work in the vicinity of heavy moving machinery or otherwise exposure to excessive floor vibrations; no operation of mobile equipment or otherwise exposed to jarring, jostling or jolting; no commercial driving; only occasional operation of foot (pedal) controlled equipment; no exposure to excessive air pollutants; pulmonary irritant or allergens (well ventilated worksite); no exposure to temperature extremes; no work in damp-humid conditions; and should be permitted to wear corrective eyeglasses as desired. (T. 19).

Accordingly, the ALJ found that plaintiff could perform a significant range of light work

but concluded that she was unable to perform any of her past relevant work. (T. 19). Since

plaintiff claimed that she suffered from exertional and non-exertional limitations, the ALJ

obtained the testimony of a vocational expert to determine whether there were jobs plaintiff

could perform.  Based upon the vocational expert's testimony, the ALJ concluded at step five,

that there were a significant number of occupations in the national and regional economy that

plaintiff could perform, such as work as an assembler, electric sealing machine operation,

surveillance system monitor, final assembler and preparer. (T. 19). Therefore, the ALJ

concluded that plaintiff was not under a disability as defined by the Act.  (T. 20).

## V.      DISCUSSION

A Commissioner's determination that a claimant is not disabled will be set aside when

the factual findings are not supported by "substantial evidence."  42 U.S.C. § 405(g); *see also*

*Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000).  Substantial evidence has been interpreted to

mean "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id.*  The Court may also set aside the Commissioner's decision when it is based upon legal error.  *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).

In seeking federal judicial review of the Commissioner's decision, plaintiff argues that: (1) the ALJ's decision that plaintiff's depression was not a severe impairment is not supported by substantial evidence; (2) the ALJ's RFC determination is not supported by substantial evidence; and (3) the ALJ posed an incomplete hypothetical to the vocational expert and thus, the Commissioner did not sustain his burden of proof at step five of the sequential evaluation process.  (Dkt. No. 10).

### A.        Severity of Plaintiff's Mental Impairments

Plaintiff argues that the ALJ's determination that plaintiff's depression was not severe is not supported by substantial evidence.  (Dkt. No. 10,  p. 11).  The Commissioner contends that the ALJ considered all evidence and reasonably concluded that plaintiff did not have severe depression.  (Dkt. No. 13, p. 5).

Plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of her impairment.  *See* 20 C.F.R. § 404.1520(c).  An impairment is severe if it significantly limits physical or mental abilities to do basic work activities.  20 C.F.R. §§ 404.1520(c), 416.920(c).  The severity analysis at step two may do no more than screen out *de minimis* claims.  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (holding that it does not appear possible for an impairment to be less than "severe" but "more than slight or minimal," because "severe" includes the entire range above slight or minimal).

The Regulations require the ALJ to utilize a "special technique" at each step of the administrative review process when a claimant suffers from a mental impairment.  *Rosado v. Barnhart*, 290 F.Supp.2d 431, 437 (S.D.N.Y. 2003) (citations omitted); 20 C.F.R. §§

13

404.1520a(a); 416.920a(a).  First, the ALJ must evaluate the claimant's symptoms, as well as other signs and laboratory findings, and determine whether the claimant has a "medically determinable mental impairment."  20 C.F.R. §§ 404.1520a(b)(1), 416.920a(b)(1); *see also Dudelson v. Barnhart*, 2005 WL 2249771, at *12 (S.D.N.Y. 2005).  If a medically determinable impairment exists, the ALJ must "rate the degree of functional limitation resulting from the impairment [ ]."  20 C.F.R. §§ 404.1520a(b)(2), 416.920a(b)(2).

In this case, the ALJ discussed plaintiff's treatment at Ellis Hospital and determined plaintiff's depression was "less than severe". (T. 14).  However, the ALJ concluded that:

> Since the claimant was found to have symptoms which satisfy the mental conditions of mild depression, she satisfies the "A" criteria, and an evaluation of the degree of her functional limitations are necessary under the "B" criteria. (T. 14).

Therefore, although the ALJ concluded that plaintiff's depression was "less than severe", the ALJ continued with the evaluation rather than terminating the discussion at step two of the sequential analysis.  Accordingly, the Court finds plaintiff's argument immaterial as it has no bearing on the remainder of the analysis.  Plaintiff has placed "undue emphasis" on the distinction between impairments that are "severe" and those that are not.  *See Ford v. Astrue*, 2008 WL 268360, at *3 (E.D.Ark. 2008).  Even if the ALJ determined that plaintiff's depression was severe, plaintiff must still satisfy the second prong of the analysis and establish that she suffered from marked limitations to daily activities, social functioning or maintaining concentration or instances of decompensation.  *See Munn v. Comm'r of Social Sec*., 2008 WL 2242654, at *10 (N.D.N.Y. 2008); *see also Armstrong v. Comm'r of Social Sec*., 2008 WL 2224943, at *12 (N.D.N.Y. 2008) (holding that even if the ALJ had determined that the plaintiff's depression was a medically determinable impairment, substantial evidence must exist

to support a conclusion that the condition was severe and precluded the plaintiff from doing basic work activities).

> **B.** **Paragraph "B" Criteria**

At step three of the sequential analysis, with respect to mental impairments, the ALJ must rate the degree of the claimant's functional limitation in four specific areas, referred to as "Paragraph B" criteria: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §§ 404.1520a(c)(3); 416.920a(c)(3).  The ALJ rates the first three areas on a five-point scale of "none," "mild," "moderate," "marked," and "extreme," and the fourth area on a four-point scale of "none," "one or two," "three," and "four or more." 20 C.F.R. §§ 404.1520a(c)(4); 416.920a(c)(4).  A ranking of no or "mild" limitation in all of these areas would generally warrant a finding that the claimant's mental impairments are not severe.  *Rosado,* 290 F.Supp.2d at 437.

To satisfy § 12.04(B)[15], plaintiff must demonstrate at least two of the following criteria: marked restriction of activities of daily living; or marked difficulties in maintaining social functioning; or marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04; *Paratore v. Comm'r of Social Sec. Admin.*, 2008 WL 541156, at *5 (N.D.N.Y. 2008); *Rodriguez v. Barnhart,* 2005 WL 643190, at *11 (S.D.N.Y. 2005).

In this case, the ALJ found that plaintiff's degree of limitation in the areas of "activities of daily living" and "deterioration or decompensation in work or work-like settings" was "none".[16] (T. 15).   The ALJ also found that plaintiff had a mild degree of limitation in the area

---

[15] Listing 12.04 addresses affective disorders.  The ALJ specifically addressed and applied this section of the Listings in the decision.  (T. 15). Plaintiff does not object to this determination.

[16] Plaintiff does not object to this portion of the ALJ's determination.

of "social functioning" and a "mild to moderate" degree of limitation in the area of "concentration, persistence and pace". (T. 15). Therefore, the ALJ concluded that "the claimant does not equal in combination a listed impairment, even when taking into consideration those impairments deemed not severe". (T. 15). Plaintiff argues that substantial evidence does not support the ALJ's determination that plaintiff's depression did not equal a listed impairment. (Dkt. No. 10, p. 14).

### 1.      Attention and Concentration

Plaintiff claims that the ALJ's determination that plaintiff's limitations are "mild to moderate" in the area of attention and concentration constitutes a "concession that plaintiff's depression is severe". [17] (Dkt. No. 10, p. 14). Further, plaintiff argues that the ALJ's determination that plaintiff suffers from mild limitations in her ability to concentrate is not supported by substantial evidence.[18]  *Id*.

As discussed previously, in order to satisfy the criteria for Paragraph B of Listing 12.04, plaintiff must suffer from a **marked** restriction in one of the four areas.  *See White v. Comm'r of Social Sec.,* 2008 WL 820177, at *10 (N.D.N.Y. 2008) (emphasis added).   Plaintiff argues that a determination of "mild to moderate prove[s] her depression was severe".  (Dkt. No. 10, p. 15). Based upon the aforementioned discussion, this portion of plaintiff's argument is unsupported and without merit.

With respect to "concentration, persistence or pace", the ALJ found plaintiff's limitations to be "mild to moderate" and cited to plaintiff's testimony that she had trouble "focusing when cooking" and "cannot work because she cannot focus on a job". (T. 15).   The

---

[17] Plaintiff does not cite to any caselaw or statutory authority to support this argument.

[18] Plaintiff does not argue that she suffers from a marked impairment in this functional area.

ALJ also noted Dr. Guenther's opinion that plaintiff's ability to concentrate was "moderate". (T. 15). Further evidence supports the ALJ's determination. Plaintiff's treatment records from Ellis Hospital do not contain any notations regarding plaintiff's lack of ability to concentrate or focus. Dr. Poll indicated on several different occasions that plaintiff considered working part time and expressed an interest in computer and GED classes but was constrained due to "child care". (T. 174-188). In addition, Dr. Seltenreich noted plaintiff's recent and remote memory skills were "grossly intact" and opined that plaintiff had "mild problems" with attention and concentration. (T. 116-117). Upon review of the administrative transcript, the Court concludes that the ALJ's determination is supported by substantial evidence.

### 2.      Social Functioning

Plaintiff argues that substantial evidence does not support the ALJ's assessment that plaintiff was mildly limited in social functioning.[19] (Dkt. No. 10, p. 16). "Social functioning refers to an individual's capacity to interact appropriately and communicate effectively with other individuals". *Bergman v. Sullivan*, 1989 WL 280264, at * 4 (W.D.N.Y. 1989).

The ALJ noted that plaintiff was able to communicate effectively with others, shopped, took public transportation and socialized with a few friends. (T. 15). The ALJ also noted that plaintiff stated that "she liked to be by herself". (T. 15). In addition to the testimony cited by the ALJ, further evidence indicates that plaintiff maintained a relationship with her family and visited her daughter on more than one occasion. (T. 138-177). Moreover, plaintiff stated that she "talked almost every day on the phone", went outside with her grandchildren and talked with people she knew. (T. 85). Plaintiff stated that she lost interest in socializing with people and family but that she did not have problems getting along with people. (T. 85). In the

---

[19] Plaintiff does not assert that she suffers from a marked impairment in social functioning.

17

Psychiatric Review Technique, Dr. Guenther found plaintiff suffered from a mild limitation in social functioning. (T. 129).  Accordingly, the Court finds that substantial evidence in the record supports the ALJ's determination.

Based upon the aforementioned, the ALJ's determination that plaintiff's mental impairment does not satisfy the requirements Paragraph B and thus does not qualify as an impairment listed in Appendix 1of the Regulations is supported by substantial evidence. Accordingly, the ALJ properly continued with the sequential analysis and discussed plaintiff's RFC.

### C.      RFC Assessment

Residual functional capacity is:

> "what an individual can still do despite his or her limitations . . . .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

*Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96-8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996)).  In making a residual functional capacity determination, the ALJ must consider a claimant's physical abilities, mental abilities, symptomology, including pain and other limitations which could interfere with work activities on a regular and continuing basis.  20 C.F.R. § 404.1545(a)**.**

With respect to a mental impairment, "[i]n the event the impairment is deemed severe, but does not meet or equal a listed mental disorder, the Commissioner next analyzes the claimant's RFC".  *White,* 2008 WL 820177, at *8 (citing 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c)).  "Use of the four broad functional categories outlined

in § 416.920a to determine whether a claimant's impairments are 'severe' is not equivalent to a mental RFC assessment." *Rosado*,  290 F.Supp.2d at 441 (holding that the use of the "B" criteria to determine whether the plaintiff's impairments are "severe" is a separate and distinct step from assessing her mental RFC, which is expressed as work-related functions).  SSR 96-8p requires a more detailed assessment than the criteria used to rate the severity of mental impairments. *Rosado*, 290 F.Supp.2d at 441 (citing 20 C.F.R. Pt. 404 , Subpt. P. App. 1 § 12.00(A) (finding that the RFC assessment "complements" the "B" criteria by requiring consideration of an expanded list of work-related capacities that may be affected by mental disorders).   If an ALJ finds that the claimant suffered from any mental impairment, "no matter how unsevere", he has the duty to take that into account when determining plaintiff's capabilities. *Gray v. Astrue*, 2007 WL 2874049, at *7 (S.D.N.Y. 2007).

When determining mental RFC, the ALJ is required to itemize various functions contained in the broad categories. SSR 96-8p, 1996 WL 374184, at *4.  The particular functions that must be assessed are the basic work-related mental activities specified by the regulations - such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting-to such a degree as to reduce his or her ability to do past relevant work and other work.  *See* 20 C.F.R. §§ 404.1520a(d)(3), 404.1545(c), 416.920a(d)(3), 416.945(c); *see also White*, 2008 WL 820177, at *8; *see also Pabon v. Barnhart*, 273 F.Supp.2d 506, 516 (S.D.N.Y. 2003).

SSR 85-16 sets forth what evidence the Commissioner should consider when assessing a claimant's mental residual functional capacity, and provides:

The determination of mental RFC involves the consideration of evidence, such as:

History, findings, and observations from medical sources (including psychological test results), regarding the presence, frequency, and intensity of hallucinations,

delusions or paranoid tendencies; depression or elation; confusion or disorientation; conversion symptoms or phobias; psychophysiological symptoms; withdrawn or bizarre behavior; anxiety or tension.

When a case involves an individual . . . who has a severe impairment(s), which does not meet or equal the criteria in the Listing of Impairments, the individual's RFC must be considered in conjunction with the individual's age, education, and work experience. While some individuals will have a significant restriction of the ability to perform some work-related activities, not all such activities will be precluded by the mental impairment. However, all limits on work-related activities resulting from the mental impairment must be described in the mental RFC assessment.

SSR 85-16, Policy Interpretation Ruling Titles II and XVI: Residual Functional Capacity for Mental Impairments, 1985 WL 56855, *2 (S.S.A. 1985).  Courts will not hesitate to reverse and remand a case where the ALJ's mental residual functional capacity assessment did not follow the mandates of SSR 85-16. *See Schaal v. Callahan*, 993 F.Supp. 85, 93 (D.Conn. 1997).

In this case, the ALJ determined that plaintiff had the RFC to:

lift/carry 20 pounds occasionally and 10 pounds frequently; stand/be on feet at least 4 hours total, one hour without interruption; no prolonged walking (½ hour at a time); sit at least five to six hours total, two hours without interruption; occasional pushing/pulling with lower extremities; no sustained/frequent overhead work; no climbing high ladders or working at unprotected heights (four feet); only occasionally climb stairs/steps/ramps; only occasionally bend/stoop, balance, (with supported/assisted at crouching/squatting), kneel or crawl; no work in the vicinity of heavy moving machinery or otherwise exposure to excessive floor vibrations; no operation of mobile equipment or otherwise exposed to jarring, jostling or jolting; no commercial driving; only occasional operation of foot (pedal) controlled equipment; no exposure to excessive air pollutants; pulmonary irritant or allergens (well ventilated worksite); no exposure to temperature extremes; no work in damp-humid conditions; and should be permitted to wear corrective eyeglasses as desired. (T. 19).

The ALJ then discussed the requirements of "light work" and determined that plaintiff was capable of performing a significant range of light work.  (T. 17).

Plaintiff argues that substantial evidence of plaintiff's depressive disorder exists and therefore, the ALJ's RFC assessment should have included plaintiff's mental limitations.  (Dkt. No. 10, p. 18).  Specifically, plaintiff claims that the ALJ failed to consider and adopt all of Dr.

Guenther's opinions and failed to consider plaintiff's treatment records from Ellis Hospital. *Id*. The Commissioner contends that the RFC determination is supported by substantial evidence. (Dkt. No. 13, p. 11).

In this case, the RFC determination is devoid of any mental limitations. The ALJ failed to mention plaintiff's depression and failed to discuss specific work-related capacities, for example, understanding instructions, using judgment, and responding to supervision. Even though the ALJ deemed plaintiff's depression "less than severe", he also found that she suffered from "mild depression". (T. 14). Accordingly, the ALJ should have included an analysis of plaintiff's depression in the context of plaintiff's RFC.

Moreover, upon review of the administrative record, the Court finds that the RFC determination is not supported by substantial evidence. While the ALJ discussed some evidence, it is unclear on what specific evidence the ALJ relied in making the RFC determination. The ALJ stated that he considered:

> all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 416.929, and SSR 96-7p. The undersigned must also consider any medical opinions, which are statements from acceptable medical sources, which reflect judgments about the nature and severity of the impairments and resulting limitations (20 C.F.R. § 416.927 and SSR 96-2p and 96-6p). (T. 16).

However, the ALJ did not cite to any medical opinion as support for his assessment of plaintiff's RFC. Further, the ALJ failed to assign any weight to any medical opinion including the opinions of the consultative examiners. Although the ALJ seemingly relied upon Dr. Guenther's assessments, the ALJ failed to assign weight to any of Dr. Guenther's opinions. *Babcock v. Barnhart*, 412 F.Supp.2d 274, 281-283 (W.D.N.Y. 2006) (citing *Torregrosa v. Barnhart*, 2004 WL 1905371, at *6 (E.D.N.Y. 2004) (finding that in the absence of a treating

source's opinion, there is more reason for the ALJ to discuss the opinions of the examining doctors and to explain the weight afforded to those opinions).  The ALJ's failure to explain the weight he gave to the opinions in the record was legal error requiring remand.  *See White v. Secretary of Health & Human Servs.*, 910 F.2d 64, 65 (2d Cir. 1990) (holding that if an ALJ fails to provide the basis for his RFC determination, a reviewing court may vacate that decision).

Plaintiff also contends that the ALJ failed to properly develop the record with respect to plaintiff's mental impairments.[20]  (Dkt. No. 10, p. 20).  An ALJ must affirmatively develop the record in light of the "essentially non-adversarial nature of a benefits proceeding", even if the claimant is represented by counsel.  *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *see also Echevarria v. Secretary of Health and Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)).  The duty of an ALJ to develop the record is "particularly important" when obtaining information from a claimant's treating physician due to the "treating physician" provisions in the regulations.[21]  *Devora v. Barnhart*, 205 F. Supp.2d 164, 172 (S.D.N.Y. 2002).  "There is ample case law suggesting that an ALJ has an independent duty to make reasonable efforts to obtain a report prepared by a claimant's treating physician in order to afford the claimant a full and fair hearing."  *Devora*, 205 F. Supp. 2d at 174 (collecting cases).  This obligation includes obtaining the treating physicians' assessments of plaintiff's functional capacity.  20 C.F.R. § 404.1512(e); *see also Hardhardt v. Astrue*, 2008 WL 2244995, at *9 (E.D.N.Y. 2008).

---

[20] Plaintiff makes this objection only as it relates to the ALJ's analysis of the RFC.  Plaintiff did not raise this argument in the context of any other portion of the ALJ's determination including the analysis of severity.  Thus, the Court will address the ALJ's duty only as it applies to the analysis of plaintiff's RFC.

[21] Under the regulations, a treating source's opinion is entitled to controlling weight if well-supported by medically acceptable clinical and laboratory diagnostic techniques and is consistent with other substantial evidence in the record.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

The Regulations state, in relevant part: "Before we make a determination that you are not disabled, we will develop your complete medical history ... [and] will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports." *Pabon*, 273 F.Supp.2d at 517 (citing 20 C.F.R. § 416.912(d)); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996).   Remand is necessary if the ALJ fails to attempt to contact the plaintiff's treating physician to properly determine her RFC.  *See Rosa v. Apfel,* 1998 WL 437172, at *4 (S.D.N.Y. 1998); *see also Hopper v. Comm'r of Social Sec.*, 2008 WL 724228, at *11 (N.D.N.Y. 2008); *see also Oliveras ex rel. Gonzalez v. Astrue*, 2008 WL 2262618, at *6-7 (S.D.N.Y. 2008) (holding that remand is appropriate even where there is no guarantee that the outcome will change, so that the ALJ can make reasonable efforts to obtain the treating physicians opinion on functional capacity).

In this case, the administrative transcript does not contain any statements from any of plaintiff's treating sources regarding how plaintiff's impairments affect her ability to perform work-related activities.  The ALJ had nothing more than treatment records from Ellis Hospital Mental Health and consultative reports to review.  Thus, the ALJ had an affirmative duty, even if plaintiff was represented by counsel, to develop the medical record and request that plaintiff's treating physicians assess plaintiff's functional capacity.  The ALJ's failure to seek medical evaluations from plaintiff's treating sources and to apply the proper standard to assess plaintiff's ability to meet the mental demands of work, deprived plaintiff of a full hearing.  *Rosado,* 290 F.Supp.2d at 441-442 (citing *Echevarria,* 685 F.2d at 755).

Remand is appropriate in instances, such as this, when the reviewing court is "unable to fathom the ALJ's rationale in relation to the evidence in the record" without "further findings or clearer explanation for the decision." *Williams v. Callahan*, 30 F.Supp.2d 588, 594 (E.D.N.Y.

1998) (citing *Pratts*, 94 F.3d at 39).  Based upon the incomplete medical record, a detailed

analysis of plaintiff's mental RFC is lacking.  On remand, the ALJ should make attempts to

obtain statements from plaintiff's treating sources regarding her residual functional capacity and

to assign the appropriate weight to such opinions.  *See O'Halloran v. Barnhart*, 328 F.Supp.2d

388, 394 (W.D.N.Y. 2004); *see also Donato v. Secretary of Dep't of Health and Human Servs*.,

721 F.2d 414, 419 (2d Cir. 1983) (holding that the ALJ has the duty to not only develop the

proof but carefully weight it).

### D.    Vocational Expert

The ALJ found that "[t]he claimant's ability to perform all or substantially all of the

requirements of light work is impeded by additional exertional and/or non-exertional

limitations". (T. 18).  During the hearing, the ALJ posed a series of hypothetical questions to

the vocational expert in order to ascertain whether there were any jobs plaintiff could perform

despite her limitations. (T. 224).   Plaintiff argues that the ALJ erred by relying on the

vocational expert's response to a hypothetical that did not include all of plaintiff's limitations.

(Dkt. No. 10, p. 20).  Defendant claims that the hypothetical accurately reflected the ALJ's RFC

determination which was supported by substantial evidence. (Dkt. No. 13, p. 11).  In the

alternative, the Commissioner contends that even though the ALJ's RFC determination did not

contain mental limitations, the ALJ included the mental limitations in his hypothetical to the

expert.  (Dkt. No. 13, p. 11).  Thus, the defendant asserts that the ALJ's determination at Step 5

is supported by substantial evidence.  (Dkt. No. 13, p. 12).

At the fifth step of the sequential evaluation of disability, the Commissioner bears the

responsibility of proving that plaintiff is capable of performing other jobs existing in significant

numbers in the national economy in light of plaintiff's residual functional capacity, age,

education, and past relevant work.  20 C.F.R. §§ 416.920, 416.960.  Ordinarily, the

Commissioner meets his burden at this step "by resorting to the applicable medical vocational

guidelines (the grids), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986)."  *Bapp v. Bowen*, 802 F.2d

601, 604 (2d Cir. 1986).  Sole reliance on the grids is inappropriate where the guidelines fail to

describe the full extent of a claimant's limitations.  *Id*. at 606.  For example, use of the grids as

the exclusive framework for making a disability determination may be precluded where, as

here, plaintiff's physical limitations are combined with non-exertional impairments which

further limit the range of work she can perform.  *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).

In these circumstances, the Commissioner must "introduce the testimony of a vocational expert

(or other similar evidence) that jobs exist in the economy which claimant can obtain and

perform."  *Bapp*, 802 F.2d at 603; *see also Melchior v. Apfel*, 15 F. Supp. 2d 215, 58 (N.D.N.Y.

1998) (stating "where nonexertional limitations significantly diminish the ability to perform a

full range of work, it is appropriate that the ALJ present testimony from a vocational expert").

A hypothetical question that does not present the full extent of a claimant's impairments

cannot provide a sound basis for vocational expert testimony.  *Bosmond v. Apfel*, 1998 WL

851508, at *8 (S.D.N.Y. 1998) (citation omitted); *see also De Leon v. Secretary of Health and

Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984).  If a hypothetical question does not include all

of a claimant's impairments, limitations and restrictions, or is otherwise inadequate, a vocational

expert's response cannot constitute substantial evidence to support a conclusion of no disability.

*Melligan v. Chater*, 1996 WL 1015417, at *8 (W.D.N.Y. 1996).

The "[p]roper use of vocational testimony presupposes both an accurate assessment of

the claimant's physical and vocational capabilities, and a consistent use of that profile by the

vocational expert in determining which jobs the claimant may still perform."  *Lugo v. Chater*,

932 F. Supp. 497, 503 (S.D.N.Y. 1996).  Further, there must be "substantial evidence to support the assumption upon which the vocational expert based his opinion." *Dumas v. Schweiker*, 712 F.2d 1545, 1554 (2d Cir. 1983).

In this case, the ALJ properly sought the testimony of a vocational expert because he determined that plaintiff suffered from non-exertional limitations. *See Bapp*, 802 F.2d at 606. However, as discussed above, the ALJ improperly assessed plaintiff's RFC.  Because the ALJ did not have a complete and comprehensive medical record from treating sources before him when he determined that plaintiff was not disabled, it necessarily affected both his RFC assessment of plaintiff and the vocational hypothetical under step five of the evaluation process. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) (stating that testimony of a vocational expert is only useful if it addresses the particular limitations of the claimant).

With regard to defendant's contention that the ALJ properly relied upon the vocational expert's testimony because hypothetical included plaintiff's alleged mental limitations, the Court finds this objection to be lacking.  The RFC findings contained in the decision must match the hypothetical posed to the expert.  *See Hill v. Astrue*, 2007 WL 4741371, at *6, n. 4 (D.Kan. 2007) (citing *Hargis v. Sullivan*, 945 F.2d 1482, 1492 (10th Cir. 1991)); *see also Gulo v. Barnhart*, 2002 WL 1880705, at *11 (N.D. Ill. 2002) (remanded by Seventh Circuit for further consideration because the RFC listed by the ALJ did not match the hypothetical posed to the vocational expert).  On remand, any hypothetical questions posed to a vocational expert and relied upon by the ALJ should incorporate a proper RFC finding supported by substantial evidence.

## VI.   CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED** that the decision denying disability benefits be **REVERSED** and this matter be **REMANDED** to the Commissioner, pursuant to 42 U.S.C. § 405(g) for further proceedings consistent with the above; and it is further

**ORDERED** that pursuant to General Order # 32, the parties are advised that the referral to a Magistrate Judge as provided for under Local Rule 72.3 has been **RESCINDED**, as such, any appeal taken from this Order will be to the Court of Appeals for the Second Circuit; and it is further

**ORDERED** that the Clerk of Court enter judgment in this case.

**IT IS SO ORDERED.**

Dated: September 17, 2008
        Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge

27